UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| S.A. AND L.A., BY THEIR NEXT FRIEND ANGIE ALLEN; H.B., BY HER NEXT FRIEND JULIE BEANER; Ad.S. AND Al.S., BY THEIR NEXT FRIENDS BRYAN SCHAVE AND BRANDI SCHAVE; S.D., BY HER NEXT FRIENDS JENNIFER DEGROOT AND PHILIP DEGROOT; A.L., BY HER NEXT FRIEND NATHAN LEUNING; M.B., BY HER NEXT FRIEND JOSEPH BILDERBACK; M.D., BY HER NEXT FRIEND DAVID DENSON; M.W., BY HER NEXT FRIENDS EUGENE WARE AND MARSHA WARE; K.A., BY HER NEXT FRIEND CATHY ANDERSON, and R.T., BY HER NEXT FRIENDS LUKE AND BOBBIE TIBBETTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:23-cv-04139-KES |
| Plaintiffs, | ) | |
| | ) | |
| v. | )<br>) | |
| SIOUX FALLS SCHOOL DISTRICT 49-5; DR. JANE STAVEM, in her official capacity as Superintendent of the Sioux Falls School District 49-5, and CASEY MEILE, in his official capacity as Coordinator of Athletics for the Sioux Falls School District No. 49-5 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

Case No. 4:23-cv-04139-KES

BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## **INTRODUCTION**

    With this action, a diverse group of girls, ranging in age from kindergarten to a high

school senior, seek to enjoin the Sioux Falls School District (the "District") from terminating the

1

girls' gymnastic program and thereby violating Title IX's requirement that female students be afforded substantially the same participation opportunities as their male peers.

The lawsuit comes in response to the District's decision to eliminate gymnastics, despite strong opposition and evidence that its actions would violate Title IV.  Educators and school board members responsible for setting budgets and allocating resources have a daunting task.  But in performing that task, school officials have at least one non-negotiable duty:  they must follow the law.  And in this case, the District has failed to do that.

It appears that District officials believed that cutting gymnastics would not violate Title IX because the District had recently added other girls' sports, including softball and wrestling.  But this misstates the relevant standard: it is not the number of sports on offer that matters, but the overall percentage of participation for each gender and the extent to which the extent of participation opportunities is disproportionate.  By eliminating the girls' gymnastics program, District officials took an already uneven playing field and made it even more inequitable.

Plaintiffs seek a temporary restraining order barring the District from selling gymnastics equipment that was previously used for its program and a preliminary injunction preventing the District from implementing its decision to eliminate gymnastics as a school sport.  Such an injunction is the sole remedy available to prevent the District from enforcing a decision that would take its athletic program out of compliance with the requirements of Title IX and its implementing regulations.  Moreover, a preliminary injunction is necessary to avoid irreparable harm.

Plaintiffs seek relief on an expedited basis because the gymnastics season is set to begin on October 30, 2023.  Plaintiffs seek an injunction that is effective before that date, and application of the four relevant *Dataphase* factors confirms that Plaintiffs are entitled to such

relief.  For these reasons, Plaintiffs respectfully request an expedited hearing on their request for preliminary injunctive relief and ask that the Court grant the requested relief.

## FACTUAL BACKGROUND

### A. The Flawed Decision-Making Process that Led the District to Eliminate Gymnastics as a School Sport

The discussions regarding the fate of high school gymnastics apparently began among high school athletic directors and was continued with a group known as the Advisory Council (the "Council"), which consisted of 21 members.  All of the 21 members were men; none of the 21 members were affiliated with the gymnastics program.  Parents of gymnasts sought information on the mandate of the Council, including what role it filled and what weight was attached to its recommendation, and also requested meeting minutes.  Those requests were denied.

The elimination of the gymnastics program would save the District $76,000.00 in the 2023-2024 budget.[1]  That figure should be understood within the larger context of the District's budget.  The District's proposed budget was disseminated in April 2023 and exceeded $325 million   That figure included approximately $3.25 million for athletics in FY 2023 and $3.64 million in FY 2024, with a 12% year-to-year increase.  *See* Hagen Aff., Ex G, Proposed Budget April 11, 2023, at 26.

In response to the proposed budget cuts, parents of gymnasts organized together and attempted to educate school officials on aspects of the gymnastics program that had been

---

[1] *See* Hagen Affidavit, Exhibit D, Sioux Falls Argus Leader, *Sioux Falls students won't have gymnastics by fall, pending school board vote,* April 24, 2023; also available at: https://www.argusleader.com/story/news/education/2023/04/24/sioux-falls-school-board-takes-preliminary-vote-to-elimiante-gymnastics/70148455007/

misperceived or misapprehended in the initial discussions.  Gymnasts and parents supporting the gymnastics program appeared at school board meeting held on March 27[2], Aprill 11[3], and April 24[4].  The videos demonstrate the extent of engagement from students and parents.

At the April 24 meeting, student athletes Anna Leuning and Ava Knudson shared their perspective of what being able to participate in the gymnastics program meant to them personally, particularly as young student athletes who were mentored by older high-school female peers.  A number of parents also spoke about the transformative effect that gymnastics had in their children's lives and, in some instances, how hopeful and enthusiastic their children were about the opportunity to participate in gymnastics on behalf of their schools in the near future.  A number of parents pointed out the potential illegality of the decision under Title IX and lamented the fact that the District had seemingly already made up its mind and was not working

---

[2] The full video of the March 27, 2023 meeting is available at:

https://www.youtube.com/watch?v=hnSi4j0kw4s&list=PLmNVZDDoZjRo9sgilnYi1f4shQvNLU3sR&index=11&ab_channel=SiouxFallsSchoolDistrict

The portion of the meeting addressing the gymnastics program begins at the 11:00 minute mark.

[3] The full video of the April 11, 2023 meeting is available at:

https://www.youtube.com/watch?v=FFJsni9jVOA&list=PLmNVZDDoZjRo9sgilnYi1f4shQvNLU3sR&index=9&ab_channel=SiouxFallsSchoolDistrict

The portion of the meeting addressing the gymnastics program begins at the 4:00 minute mark.

[4] The full video of the April 24, 2023 meeting is available at:

https://www.youtube.com/watch?v=FFJsni9jVOA&list=PLmNVZDDoZjRo9sgilnYi1f4shQvNLU3sR&index=6&ab_channel=SiouxFallsSchoolDistrict

The portion of the meeting addressing the gymnastics program begins at the 39:00 minute mark.

The portion of the comment period addressing the proposed elimination of the program begins at the 39:00-minute mark.

4

to find a solution that would retain the gymnastics program, despite being presented with options that would make that possible.

Bobbie Tibbetts, next friend of Plaintiff R.T., sent an email to District officials on April 11, 2023, which included a presentation that she and other parents had assembled to educate the School Board about the gymnastics program.  *See* Hagen Affidavit, Ex. A (April 11, 2023 email); Ex. A-1 (presentation entitled "Sioux Falls High School Gymnastics").  The presentation illuminated the extent to which gymnastics equipment had previously been acquired, not with District funds, but with fundraising monies, direct parent donations, and contributions from the booster club.  The presentation also undermined a talking point from administration regarding unfulfilled coaching positions by identifying by name individuals who served as head and assistant coaches at each of the four Sioux Falls high schools.

The presentation also addressed other myths and misperceptions that pervaded the narrative presented by the administration as a putative justification for the proposal to eliminate gymnastics.  It noted that overall participation in gymnastics had increased from 2012 through 2016, but participation had decreased, not because of waning interest, but because of specific actions taken by school officials that undercut the program, including cutting middle school gymnastics, defunding bussing and other transportation, and consolidating programs so as to create a barrier for students who were required to travel across the city to practice.

Finally, the parents cited to survey data from 2 of 3 local gymnastics clubs in Sioux Falls which indicated that, of 191 total respondents, 84% expressed interest in competing in high school gymnastics at some point.  Of those who affirmed interest in high school gymnastics, there was an even distribution from 2023 through 2027 as to the time period when the gymnast in question would enter 7th grade.  The data confirms that there is sustained interest in high

school gymnastics and that the interest is consistent across age groups, including those young

gymnasts who are not yet old enough to participate but would like to do so in the near future.

On April 20, 2023, Angi Allen, next friend of Plaintiffs S.A. and L.A., sent an email to

District officials sharing her concerns and concerns of other parents "that the requirements to

maintain Title IX compliance are not currently being met" and providing data and analysis to

substantiate those concerns.  *See* Hagen Affidavit, Ex. B.   Before sharing the data and analysis,

Allen stated:

> It is our understanding that Title IX compliance has been reviewed by Administration.
> However, due to the lack of communication and transparency around the decision to cut
> the gymnastics program it has led us to search for more information and ask more
> questions to better understand the situation and educate ourselves on our options and
> avenues to help save the gymnastics program.

> It is our goal to ensure you have a full picture of the information and supporting data
> available to the public, so you know the current questions and concerns from many
> people, including the media, around Title IX compliance.

> It is our hope that you have an opportunity to review this information so additional
> questions can be asked and, ultimately, an informed vote may be cast at Monday's school
> board meeting.

*Id.*  The e-mail linked to analysis of Title IX from the National Federation of State High School

Associations, which includes frequently-asked-questions and sets forth the relevant factors to

Title IX's compliance framework.[5]  Allen's email summarized these factors, which begin with a

quantitative assessment to determine whether the percentage of female athletic participation is in

proportion to the percentage of female students in the District.  *Id.*  The assessment also

considers the student athlete population by gender to determine whether participation

opportunities are proportionate between male athletes and female athletes.  *Id.*

---

[5] The source provided in Allen's email is available at:  https://www.nfhs.org/articles/title-ix-compliance-part-iv-frequently-asked-questions/ (last visited Sept. 12, 2023).

Allen shared data that she had aggregated regarding the number of male and female student athletes, drawn from publicly available information identifying the number of players on the roster for each sport at each high school in the District.  *See* Ex. B-2, B-3, and B-4.  Applying this standard and data that Allen had aggregated, the e-mail showed that disproportionately fewer athletic participation opportunities were provided to female students in the District and that the magnitude of the disproportionality exceeded acceptable standards.  *Id.*  Allen's email also made clear that "budgetary restrictions are not justifiable reasons to excuse Title IX requirements," a principle that was likewise affirmed in the article she cited from the National Federation of State High School Associations.

On April 23, 2023, Tibbetts sent another email to District officials, which included the results of a survey conducted of gymnasts and their families at three private gymnastics facilities in Sioux Falls after the April 11, 2023 meeting.  Hagen Affidavit, Ex. C.  As noted in the e-mail, the results of the survey "demonstrate the growing relationship with the local club gyms and the overall health of the pipeline for gymnasts."  The second survey indicated the following:

> we will see an overall increase in participation of 11% in 2023-2024 and another 16% increase in 2024-2025. That is an overall increase of 28% in the next two years. These numbers speak for themselves and should provide you with the hard data to know that numbers will NOT continue to decline and there is a healthy pipeline going forward.

*Id.*  The e-mail also provided a forward-looking assessment of expected levels of participation on a school-by-school basis, as follows:

> Total current participation number of 46 for 2022-2023 season:
> - Lincoln = 24 (5 seniors)
> - Jefferson = 10 (2 seniors)
> - Roosevelt = 10 (2 seniors & 1 exchange student)
> - Washington = 2 (0 seniors)
>
> Starting number for 2023-2024 season, excluding the graduating 9 seniors and 1 exchange student, is 36.

7

Xcel feeder program commitments for Fall of 2023-2024 and Fall of 2024-2025 boost the gymnastics participation by a MINIMUM TOTAL OF 28 NEW FACES. 😊

Fall of 2023-2024 = 15 new gymnasts plus 36 existing gymnasts = 51 total for an increase of 11%

- Lincoln = 9 new
- Jefferson = 1 new
- Washington = 4 new
- Roosevelt = 1 new

Fall of 2024-2025 = 13 new gymnasts plus 51 existing gymnasts minus 5 departing seniors = 59 total for an increase of 16%, a 28% increase over 2022.

- Lincoln = 3 new
- Jefferson = 1 new
- Washington = 6 new
- Roosevelt = 3 new

*Id.*

Collectively, these communications confirmed the broad and sustained support for the gymnastics program, raised serious questions about the legality of the proposed elimination of the gymnastics program by illustrating  why the proposed elimination would take the District out of compliance with Title IX, and provided additional evidence substantiating the extent to which that proposal would reduce participation opportunities for female athletes. Nonetheless, on April 24, 2023, the District adopted the budget eliminating the gymnastics program.

**B. Evidence Supporting Underrepresentation and Gender Disparity in Participation Opportunities in the District**

Publicly-available data confirms that the District has failed to maintain sufficient gender parity in providing athletic opportunities to male and female students.

In 2022-2023, the total number of students enrolled in the District's high schools was 7,256—of which 3,550 were female and 3706 were male.  *See* Hagen Affidavit, B-1.

TABLE 1:  ENROLLMENT NUMBERS AT SFSD BY GENDER (HS)

| YEAR | Girls | Percentage Girls | Boys | Percentage Boys | Total |
|------|-------|------------------|------|-----------------|-------|
| 2022-23 | 3,550 | 48.9% | 3706 | 51.1% | 7,256 |

Approximately 1,920 high school students participated in a school-sponsored athletic program—of which 799 were female and 1,121 were male.

TABLE 2A: ATHLETIC PARTICIPATION AT SFSD BY GENDER (HS - DUPLICATED)[6]

| YEAR | Girls | Percentage Girls | Boys | Percentage Boys | Total |
|------|-------|------------------|------|-----------------|-------|
| 2022-23 | 799 | 41.6% | 1,121 | 58.4% | 1,920 |

Although female students comprise approximately 48.9% of the District's student body, female student athletes comprise only 41.6% of the students who participate in school-sponsored athletic programs.

TABLE 3A: DIFFERENCE BETWEEN GIRLS' ENROLLMENT & PARTICIPATION

| YEAR | Difference between Girls' Enrollment % & % of Girls Participating in Sports |
|------|----------------------------------------------------------------------------|
| 2022-23 | 7.3% |

Eliminating gymnastics will mean that the total number of female student athletes will decrease, and the percentage of student athletes who are female will decrease as well.  Assuming that total enrollment and the percentage of students who participate in school-sponsored athletics remains relatively constant in 2023-2024, the elimination of the gymnastics program will mean that fewer girls who want to participate in athletics will have the opportunity to do so.   That, in turn, will materially increase the gap between the total percentage of female students in the District and the total percentage of female students participating in sports offered by the District.

---

[6] The aggregate figures in this chart includes 21 middle school boys who participated in high school athletics and 21 middle school girls who did as well.  *See* Ex Hagen Affidavit, Ex. B-2.

**Not including gymnastics participants**

TABLE 2B: ATHLETIC PARTICIPATION AT SFSD BY GENDER (HS - DUPLICATED)

| YEAR | Girls | Percentage Girls | Boys | Percentage Boys | Total |
|------|-------|------------------|------|-----------------|-------|
| 2023-24 | 767 | 40.6% | 1,121 | 59.4% | 1,888 |

TABLE 3B: DIFFERENCE BETWEEN GIRLS' ENROLLMENT & PARTICIPATION

| YEAR | Difference between Girls' Enrollment % & % of Girls Participating in Sports |
|------|-----------------------------------------------------------------------------|
| 2023-24 | 8.3% |

The above data reflects that the decision to eliminate girls' gymnastics will bring the District further out of compliance with Title IX and will increase gender disparity in athletic participation opportunities as between female and male students in the District.

**APPLICABLE LAW**

**A. Standard of Review**

This Court applies the well-established *Dataphase* test in determining whether to grant preliminary relief, which consists of the following factors:  (1) the probability that the moving party will succeed on the merits of its claims; (2) the threat of irreparable harm to the moving party should the relief be denied; (3) the balance between this harm and the harm that granting the temporary restraining order will cause to the other parties to the litigation; and (4) the public interest in granting the order.

**B. Substantive Law**

Under Title IX, "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal assistance[.]" 20 U.S.C. § 1681(a).  "In short, the statute bars federally funded educational institutions from engaging in sex-based discrimination."

10

*Portz v. St. Cloud State Univ.,* 16 F. 4th 577, 580 (8th Cir. 2021).    An individual has a private

right of action under Title IX.   *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979).

      Title IX includes substantive rules and standards relating to athletic opportunities and

benefits.  A regulation promulgated by the Department of Health, Education, and Welfare

("HEW") identifies ten factors for the agency to consider in determining if an institution

"provide[s] equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c).   The

first factor requires "effective[] accommodat[ion]" of the interests and abilities for both sexes

(i.e., equitable participation opportunities)."  *Portz,* 577 F. 4th at 580 (citing and quoting 34

C.F.R. § 106.41(c)(1)).  The remaining nine factors, sometimes referred to as the laundry list, are

reviewed to determine whether the athletic programs offered by an educational institution are

providing "equal treatment and benefits" and are as follows:

> (2) provision of equipment and supplies; (3) scheduling of games and practice time;
> (4) travel and per diem allowance; (5) opportunity to receive coaching and
> academic tutoring; (6) assignment and compensation of coaches and tutors; (7)
> provision of locker rooms, practice, and competitive facilities; (8) provision of
> medical and training facilities and services; (9) provision of housing, dining
> facilities, and services; and (10) publicity.

34 C.F.R. § 106.41(c)(2)-(10).

      In 1979, HEW issued a policy interpretation to help clarify the scope and meaning of its

original regulation.  *See* 44 Fed. Reg. 71413-71423 (1979) (the "Interpretation").[7]   Reviewing

courts give "controlling deference" to the Interpretation.  *Portz,* 577 F. 4th at 580 (citation

omitted).  The 1979 Interpretation "offers more guidance about what constitutes a participation-

opportunities violation and a treatment-and-benefits violation" by requiring that athletic

---

[7] A copy of the Interpretation is available at:
https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html (last visited Sept. 12, 2023).

programs offered by an educational institution meet one of three standards, known as the "the three part test." *Id.*

A federally-funded institution may establish compliance in one of three ways, as outlined by the three-part test in the Interpretation:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest[s] and abilities of the members of that sex; or

> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

1979 Policy Interpretation, 44 Fed. Reg. at 71,418.  It is well-established that the Interpretation applies to high school athletic programs.   *See McCormick ex rel. McCormick v. School Dist. of Mamaroneck,* 370 F.3d 275, 300 (2d Cir. 2004) (applying three-part test to high school districts); *Horner v. Ky. High Sch. Athletic Ass'n,* 43 F.3d 265, 272-75 (6th Cir. 1994) (same).

The Office of Civil Rights (the "OCR"), Department of Education, further clarified the analysis of the first prong of the test on January 16, 1996, when it issued its Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (hereafter, the "1996 Clarification"). The analysis of the first prong– whether "participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments," 44 Fed. Reg. at 71,418— "begins with a determination of the number of participation opportunities afforded to male and female athletes."   Hagen Aff., Ex. F, at 6

(quoting 1996 Clarification).  In making this determination, reviewing courts are to count "actual athletes," not "unfilled slots," because Title IX participation opportunities are "real, not illusory." *Id.* at 3 (quoting Letter from Norma V. Cantú, Assistant Sec'y for Civil Rights, Office of Civil Rights, U.S. Dep't of Educ., to Colleagues (Jan. 16, 1996) ("1996 Letter")).[8]

With respect to the third prong, the 1996 Clarification presents three questions that the OCR and reviewing courts should consider: (1) whether there is sufficient unmet interest to support a team; (2) whether there is a sufficient ability to sustain a team; and (3) whether there is a reasonable expectation of competition for that team.  *Id.* at 9.   "If all three conditions are present, OCR will find that an institution has not fully and effectively accommodated the interests and abilities of the underrepresented sex."  *Id.*

## C. Reviewing Courts have broad discretion as to the nature and timing of remedies for Title IX violations.

While Title IX does not require institutions to fund any particular number or type of athletic opportunities, individuals who are harmed by violations of Title IX are entitled to redress.  The scope of available relief therefore includes reinstating specific sports programs in appropriate circumstances.  In *Favia v. Indiana University of Pennsylvania,* 812 F. Supp. 578 (W.D. Pa. 1992), female students brought a class action alleging systemic discrimination on the basis of gender in the university's intercollegiate athletic program.  After finding that injunctive relief was appropriate, the District Court ordered reinstatement of the women's gymnastics and field hockey teams under the following analysis:

> By cutting the women's gymnastics and field hockey teams, IUP has denied plaintiffs the benefits to women athletes who compete interscholastically: they develop skill, self-confidence, learn team cohesion and a sense of accomplishment, increase their physical and mental well-being, and develop a

---

[8] A copy of this document, along with the 1996 Clarification, is available at: https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html#two (last visited Sept. 12, 2023).

> lifelong healthy attitude.   The opportunity to compete in undergraduate interscholastic athletics vanishes quickly, but the benefits do not.  We believe that the harm emanating from lost opportunities for the plaintiffs are likely to be irreparable.

*Id.* at 583, *mot. to modify order denied,*7 F.3d 332 (3d Cir. 1993).  Other courts have also concluded that reinstatement of women's sports teams was appropriate as part of the remedy to violations of Title IX.  *See, e.g., Cohen v. Brown Univ.*, 809 F. Supp. 978, 1001 (D.R.I. 1992) *affirmed* 991 F.2d 888 (1st Cir. 1993) (reinstating women's gymnastics and women's volleyball teams).

Additionally, the Court also has latitude in imposing remedies on an expedited basis to avoid irreparable harm.   For example, in *Barrett v. West Chester University of Pennsylvania*, 2003 U.S. Dist. LEXIS 21095 (E.D. Pa. Nov 13, 2003), the court issued a preliminary injunction reinstating the women's gymnastics team because "[p]reventing the 2004 season from moving forward will deny players one of only four competitive seasons at the college level.  Several of the players are in their final year of school and would be denied their last opportunity to compete.  Only the reinstatement of the gymnastics program could avoid this harm."  2003 U.S. Dist. LEXIS 21095, at *47.[9]

The Court also has authority to ensure that a defendant complies with specific terms of expedited relief in a timely, comprehensive fashion.  For example, in *Roberts v. Colorado State Univ.,* 814 F. Supp. 1507, 1519 (D. Colo. 1993), the district court addressed Colorado State University's ("CSU") failure to comply in a timely fashion with the permanent injunction reinstating the women's softball team by ordering CSU to hire a coach, obtain a field, provide equipment and uniforms, undertake recruiting, and prepare for a fall exhibition season.  The

---

[9]  A copy of this decision is being provided as part of Plaintiffs' submission.  *See* Ex. E, Hagen Affidavit.

Tenth Circuit upheld almost every requirement set forth in the district court's order, except for the obligation that it field a team during the fall exhibition season to prepare for the spring competitive season. *See Roberts II,* 998 F.2d at 834-35. In rejecting defendant's argument that the court was impermissibly "micromanaging" the CSU athletics program, the Tenth Circuit explained that "[u]nder the broad sweep of Title IX, the district court has the power to ensure that the reinstated softball program receives all the incidental benefits of varsity status." *Id.* at 834.

## **ARGUMENT**

Under the four-prong *Dataphase* test, Plaintiffs are entitled to injunctive relief. Plaintiffs are likely to prevail on the claim that the District's decision violates the constraints imposed by federal law requiring a baseline level of gender equity in high school athletics. The decision exposes Plaintiffs to the irreparable harm of being denied the opportunity to participate in this sport and the elimination of participation opportunities for the foreseeable future. The balance of harms strongly tilts in Plaintiffs' favor, as a modest expenditure in a multi-million-dollar budget pales in significance compared to upholding Plaintiffs' constitutional rights and the principle codified in federal law that female student athletes are entitled to the same opportunities, accommodations, and benefits of athletic participation as male student athletes are. Finally, the public interest is best served by an outcome in which public officials are prevented from enacting public policy that is short-sighted, inequitable, and, above all, illegal.

For these reasons, Plaintiffs are entitled to expedited relief in the form of a preliminary injunction that reinstates the gymnastics program in the District for the 2023-2024 school year and take all steps necessary to assure that Plaintiffs who are eligible to compete are provided with the opportunity to do so this year. Such relief is necessary to assure that Plaintiffs do not

suffer the prospective harm of unequal participation opportunities.  To assure that such relief is meaningful, the Court should, at the outset, enter a temporary restraining order barring the District from selling or transferring ownership of gymnastics equipment.

## I.      PLAINTIFFS ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF.

### A.  Plaintiffs are likely to prevail on their claims alleging violations of Title IX.

In considering the merits prong of the *Dataphase* test, the Eighth Circuit has clarified that "the question is not whether the movant has proved a greater than fifty percent likelihood that it will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a "fair ground for litigation." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted). "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold*, 508 F.3d at 1143.

Plaintiffs are likely to prevail on the merits of the claim that the District's decision to eliminate gymnastics violates Title IX and its implementing regulations.  As a result of the decision, the District cannot satisfy any of the three prongs established in the Interpretation— which this Court must give controlling deference.

Before the gymnastics program was cut, the District was arguably already out of compliance with Title IX.  Although female students make up approximately 48.9% of the overall student body, they comprise only 41.6 % of the student athlete population.  There is a 7.3% gap between the percentage of female students in the overall student body and the percentage of female student athletes, which represents the degree to which female student athletes are underrepresented when gymnastics was still being offered.  Eliminating gymnastics threatens to increase the degree of female student athlete underrepresentation.  Assuming that the

total population of high school students in the District and total number of student athletes remain the same, the 7.3% gap widens to 8.3%.   In sum, the result of the decision is to decrease the percentage of female student athletes and decrease female student athlete representation. Accordingly, Plaintiffs meet the burden to establish underrepresentation and gender disparity under the first prong of the three-part test established by the Interpretation.

The District cannot rebut a finding of non-compliance under the second prong by "show[ing] a history and continuing practice of program expansion which is demonstrably responsive to the developing interest[s] and abilities of the members of that sex."  This is so despite relatively recent additions of softball and girls' wresting.   That appears to be a rationale invoked by the District to justify its action.   But adding new school-sponsored sports cannot adequately compensate for eliminating others, if the net effect is to reduce opportunity and participation.  This is particularly true in the case of a "new" sport like girls' wrestling, which has relatively low participation.

The District cannot claim that it has a history and continuing practice of program expansion, when the net change is the addition of one program but a material decrease in the aggregate number of female athletes.   As *Biediger v. Quinnipiac Univ.*, 928 F. Supp. 2d 414, 458 n. 48 (D. Conn. 2013) noted, an institution "is unlikely to satisfy prong two's requirement of demonstrating a 'history and continuing practice of program expansion' for women where, as here, the [institution] recently sought to eliminate an existing varsity women's sport." *See also* Hagen Affidavit, Ex. F, at 8 (quoting 1996 Clarification) ("In the event that an institution eliminated any team for the underrepresented sex, OCR would evaluate the circumstances surrounding this action in assessing whether the institution could satisfy part two of the test . . . Cuts in the program for the underrepresented sex, even when coupled with cuts in the program

for the overrepresented sex, cannot be considered remedial because they burden members of the sex already disadvantaged by the present program.")

The District also cannot come into compliance under the third prong.  To satisfy the third prong, the District must "demonstrate that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program."  Obviously, any consideration of whether the District can meet that burden must fully recognize that the District seeks to eliminate a program in which female student athletes currently participate and future female student athletes hope to participate.

Several cases, as well as the Office for Civil Rights, note that the recent elimination of a viable team for girls will lead the OCR to "find that there is sufficient interest, ability, and available competition to sustain a [ ] team in that sport and thus there would be a presumption that the institution is not in compliance with [the third prong]."  *See* Russlynn Ali, Assistant Secretary for the Office of Civil Rights, Dep't of Education, Dear Colleague Letter, at 5 (Apr. 20, 2010); *see also Ollier v. Sweetwater Union High Sch. Dist*., 604 F. Supp. 2d 1264, 1274 (S.D. Cal. 2009) ("When a viable team is eliminated, unmet interest is strongly suggested.").

The District will not be able to overcome the "presumption that it is not in compliance with [the third prong]" in the wake of its decision to eliminate the viable high school gymnastics program.  The level of interest and commitment to competitive high school gymnastics remains strong today.   At the time of the decision, there were enough participants to fill a roster and there was demonstrable interest from younger students who expressed interest in participating once they were able to do so.   Likewise, coaches who are qualified to lead the gymnastics team remain ready and willing to fill that leadership role.  Finally, other school districts continue to provide a gymnastics program to their students, which means that "there is a reasonable

expectation of competition for the [District's gymnastics] team." Ex. F, at 9 (quoting 1996 Clarification).

No doubt, the District was on notice of much of the aforementioned evidence before it eliminated the gymnastics program. Before the District announced its proposed budget in April 2023, parents of girls participating in gymnastics in Sioux Falls provided the School Board with information, including surveys and other data, to demonstrate student athletes remained eager to participate in gymnastics. Faced with this information, the District proceeded with its proposal.

Of equal importance, the level of interest has been sustained despite actions by the District that created obstacles to participation. The District's prior decision to eliminate the middle school gymnastics program reduces opportunities for girls at the high school level, as it narrows the pool of athletes initiating participation in middle school and sustaining it into their high school years. The District also previously decided to eliminate busing and consolidate activities, an obstacle that makes it more difficult for interested female students who wish to participate in gymnastics.

Plaintiffs have introduced evidence to substantiate the existence of a level of interest, ability, and available competition to sustain a gymnastics team in the District. Under the 1996 Clarification, if all three conditions are met, "OCR will find that an institution has not fully and effectively accommodated the interests and abilities of the underrepresented sex." *Id.* at 9 (quoting 1996 Clarification). Accordingly, the District will not be able to invoke the third prong to establish compliance with Title IX.

Because the District cannot satisfy any individual prong of the three-part test set out in the Interpretation, Plaintiffs are likely to prevail on the merits of their Title IX claim. That, in turn, establishes a likelihood of success on the merits of Plaintiffs' § 1983 claims.

**B. In the absence of injunctive relief, Plaintiffs will suffer irreparable harm, the nature of which is not capable of being remedied through an award of money damages.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).   "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson,* 725 F.3d 885, 895 (8th Cir. 2013) (citations omitted).

Here, the threat of irreparable harm is real and substantial.  Unless the Court grants the requested relief, young gymnasts will lose an opportunity to compete in the sport of their choice and to represent their school and themselves.  Upper-level high school students, including Plaintiffs Anna Leuning and M.B., may never have the opportunity to compete again. Young gymnasts will be denied the benefits to their athletic abilities and to their overall development that come from being mentored by older, more advanced gymnasts, whom they look up to and even idolize.  This harm cannot be quantified in terms of money damages, nor can it be offset by suggesting that these gymnasts—who have devoted years of their lives to their sport—simply try out for volleyball, dance, or some sport for which they have no natural affinity or interest.[10]

This evidence, showing that the District's action poses a genuine threat of irreparable harm, demonstrates a compelling need for preliminary injunctive relief.

---

[10] Indeed, the suggestion that female gymnasts should consider trying out for another sport in response to the elimination of the gymnastics program reveals an unspoken bias in and of itself. Imagine an alternative universe in which the District sought to address its "fiscal cliff" by eliminating football and defended its proposed course of action by suggesting that a quarterback or wide receiver who had been playing football for a decade should simply consider trying out for the wrestling team.

**C.  The balance of the harms favors Plaintiffs, whose civil rights have been violated and will continue to be violated absent relief from the Court.**

The balance of harms favors an injunction.  Plaintiffs' harm is significant and imminent, and that harm will also fall on gymnasts who are not part of this lawsuit but are similarly situated and would also be harmed if the gymnastics program is cut.  Plaintiffs are also harmed to the extent that they perceive that their right to participate in athletics is less substantial than the right of their counterparts and that they are less deserving of protection that federal law affords than boys are.  On the other hand, the District cannot claim to be harmed by an injunction that prevents them from violating federal law, as they have no legal right to implement a decision that would take them out of compliance with Title IX and no right to immunize such a decision from the necessary corrective of an injunction from this Court.  Additionally, the District has sufficient reserve funds to field competitive gymnastics teams, despite adopting a budget that called for its elimination.

**D.  The public interest also weighs in favor of granting an injunction.**

When a governmental agency is the defendant, "the final two factors [i.e. the balance of equities between the parties and whether an injunction is in the public interest] can 'merge' into one." *Noem v. Haaland,* 542 F. Supp. 3d 898, 925 (D.S.D. 2021).  The public interest weighs strongly in favor of upholding federal law and enjoining action that would perpetuate and deepen gender inequality.  If publicly-elected officials and public employees are given a free pass to enact budget cuts and policy choices that violate Title IX and the civil rights of female students, that sends a strong message that female students are not deserving of the same opportunities as male students.   It also suggests that legislation Congress has adopted to prevent gender inequity and discrimination is ineffective or empty rhetoric.

The public interest is also advanced when public officials are held accountable, particularly when the burden of their unlawful policy choices falls on young people who do not get a vote on which officials will be elected to a position to make policy decisions.  Schools are laboratories for democracy, and the policies that young people encounter as students shape their sense of right and wrong and their sense of whether the laws will be applied fairly.  Female students not only deserve equal treatment and opportunity under Title IX, but also deserve to know that if official policy treats them unequally, they are not without a remedy.

## II.     THE COURT CAN AND SHOULD BAR THE DISTRICT FROM SELLING ANY GYMNASTICS EQUIPMENT AND ORDER THE IMMEDIATE REINSTATEMENT OF GIRLS' GYMNASTICS.

It is well-established that, in the absence of specific limitations, federal courts may award "all appropriate remedies" to correct violations of federal law.  *See, e.g., Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 66, 76 (1992) (citing *Bell v. Hood*, 327 U.S. 678, 684 (1946)).  In *Franklin,* the U.S. Supreme Court relied on this principle in affirming that a "damage remedy is available for an action brought to enforce Title IX."  *Id.*   Its reasoning confirms that federal courts have broad authority in fashioning an appropriate remedy for Title IX violations.

Plaintiffs seek entry of a Temporary Restraining Order, pursuant to Rule 65(b), to bar the District from taking any action to sell or transfer ownership of gymnastics equipment previously used as part of the District's gymnastics program.  It is Plaintiffs' understanding that the District has solicited bids for the acquisition of its equipment, with the bid submission deadline being September 11, 2023.  *See* Complaint, at ¶¶ 59-61.   As an initial step, the Court should enter a TRO barring the District from selling or conveying that equipment.

The Court's remedial authority necessarily includes preliminary injunctive relief that orders an educational institution to reinstate a specific athletic sport where the elimination of the

sport contributed to or caused the educational institution to fall out of compliance with Title IX. *See Favia,* 812 F. Supp. at 583; *Barrett,* 2003 U.S. Dist. LEXIS 21095 at *47 [Hagen Aff., Ex. E], *Roberts I,* 814 F. Supp. at 1519. Accordingly, if the Court concurs that Plaintiffs have met their burden in showing entitlement to preliminary injunctive relief, it should enter an Order granting the specific relief requested and order the District to reinstate the girls' gymnastics program for the 2023-2024 school year.

It is anticipated that reinstatement of the girls' gymnastics program, standing alone, will not be sufficient to bring the District into compliance with Title IX. Accordingly, the requested expedited relief, while necessary, will be an initial step in a lengthier process that the District must take to address the underlying violation. The Court should therefore retain jurisdiction in order to assure that the District takes steps (including but likely not limited to crafting and implementing a remedial comprehensive plan) to come into compliance with Title IX.

## CONCLUSION

Title IX requires that students of all genders receive effective accommodation and be protected from discrimination on the basis of gender. The District has charted a course that will violate this federal law and that will deprive female student athletes in the District of a level playing field. The Court can and should intervene to prevent the District from eliminating girls' gymnastics and should provide such relief on an expedited basis, so that female student athletes who desire to participate in gymnastic are not denied the opportunity to do so.

Date:   September 12, 2023.

CADWELL SANFORD DEIBERT & GARRY LLP

By  /s/ Alex M. Hagen
      Alex M. Hagen
      Claire Wilka
      200 East 10th St., Suite 200
      Sioux Falls SD 57104
      ahagen@cadlaw.com
      cwilka@cadlaw.com
      (605) 336-0828
      Attorneys for Plaintiffs
      *Electronically Filed*