# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## SOUTHERN DIVISION

| | |
|---|---|
| S.A. AND L.A., BY THEIR NEXT FRIEND ANGI ALLEN; H.B., BY HER NEXT FRIEND JULIE BEANER; Ad.S. AND Al.S., BY THEIR NEXT FRIENDS BRYAN SCHAVE AND BRANDI SCHAVE; S.D., BY HER NEXT FRIENDS JENNIFER DEGROOT AND PHILIP DEGROOT; A.L., BY HER NEXT FRIEND NATHAN LEUNING; M.B., BY HER NEXT FRIEND JOSEPH BILDERBACK; M.D., BY HER NEXT FRIEND DAVID DENSON; M.W., BY HER NEXT FRIENDS EUGENE WARE AND MARSHA WARE; KA, BY HER NEXT FRIEND CATHY ANDERSON, and R.T., BY HER NEXT FRIENDS LUKE AND BOBBIE TIBBETTS, <br><br> Plaintiffs, <br><br> vs. <br><br> SIOUX FALLS SCHOOL DISTRICT 49-5; JANE STAVEM, in her official capacity as Superintendent, and CASEY MEILE, in his official capacity as Coordinator of Athletics for the Sioux Falls School District No. 49-5, <br><br> Defendants. | Case No. 4:23-CIV-04139 <br><br><br><br><br><br><br><br><br><br> **DEFENDANTS' BRIEF OPPOSING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Defendants, Sioux Falls School District 49-5, Dr. Jane Stavem, and Casey Meile (together, "the District"), by and through counsel of record, submit this Brief opposing Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Motion").  For the reasons set forth below, the Court should deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

## INTRODUCTION

As a public institution dedicated to the advancement of nearly 25,000 students, the District is sometimes required to make difficult decisions.  In the Spring of 2023, the District, acting through its five elected school board members (four of which are women) and its female Superintendent, made the difficult decision to stop offering gymnastics.  This was not an easy decision, nor a decision the District made lightly.  But after considering (a) the significant decrease in gymnastics participants over the last several years, highlighted by the fact that only one of the District's four high schools were able to enter a full team for the state qualifiers, (b) the consistent inability to find and retain sufficient coaches at all four high schools, (c) the looming financial burdens keeping gymnastics would create, and (d) the high interest in other sport opportunities that would allow the District to expand the overall opportunities for female students, the District made the decision it believed is in the best interest for the District and its student body as a whole and cut the gymnastics program.

Now, months after the District decided to end the gymnastics program, Plaintiffs ask this Court to order the District to bring back the gymnastics program just weeks before the start of the winter sport season, with gymnastics beginning October 30, 2023.  (Plaintiffs' Brief at 2.) For all the bulk of Plaintiffs' Motion, the issue before the Court is simple: will the District comply with Title IX under the three-prong test in the 2023-2024 academic year without the women's gymnastics team?  As discussed below, the answer to that question is "yes."

Plaintiffs, the District, and this Court have no crystal ball to determine what the 2023-2024 participation numbers will hold.  The data Plaintiffs require to meet their burden of proof and show a substantial likelihood of success on the merits will not exist (if ever) until next year. Dependent on wholly theoretical and incomplete data, Plaintiffs do not, and cannot carry their

burden of proof to show that the District will fail to comply with Title IX in the 2023-2024 academic year without the gymnastics program.  As such, Plaintiffs' position is speculative, and their requested relief should be denied.

The District respectfully requests the Court refrain from granting such a hypothetical injunction for the following reasons: (1) Plaintiffs' request for a preliminary injunction is premature, as Plaintiffs' assertions that the District will not comply with Title IX for the 2023-2024 academic year are wholly speculative; (2) Plaintiffs cannot succeed on the merits of their claims because the District satisfies at least one of the three prongs of the "three-part" test; and (3) the balance of harms and public interest factors weigh in favor of the District, particularly as Plaintiffs should be estopped from requesting an injunction for the 2023-2024 academic year. For these reasons, the Court should deny Plaintiffs' Motion.

## **FACTUAL BACKGROUND**

For the sake of brevity, the District points the Court to the Affidavit of Dr. Jane Stavem (hereinafter "Stavem Aff."), incorporated by reference, as factual background.

The Sioux Falls School District is aware of its legal obligation under Title IX of the Education Amendments of 1972.  (Stavem Aff., ¶ 6.)  The District works diligently to provide diverse, equal opportunities for female and male students within the District.  (*Id.*, ¶ 7.)  Exhibit A to the Affidavit of Dr. Jane Stavem show the number of females and males participating in high school sporting activities in the Sioux Falls School District since 2004.  (*Id.*, ¶ 7, Ex. A.) The numbers documented in Exhibit A show a significant expansion of opportunities for female students.  (*Id.*, Ex. A.)  For example, in 2004, only 641 female student athletes participated in high school sports.  (*Id.*, Ex. A.)  However, by 2022, the amount nearly doubled, with 1,229 female students participating in high school sports.  (*Id.*, Ex. A.)  Exhibit B demonstrates that

2,971 high school student athletes participated in various sports during the 2022-2023 school year.  The breakdown by gender of these athletes is 1,742 males and 1,229 females.  (*Id.*, ¶ 8, Ex. B.)  Since 2008, the District has added 5 female high school sports, including competitive cheer, competitive dance, soccer, wrestling, and softball.  (*Id.*, ¶ 9.)  The Sioux Falls School District does not deny any athletic participation because of gender.  (*Id.*, ¶ 32.)  No individual is told that he or she may not play because they are male or female.  (*Id.*)  Everyone, regardless of sex, has some opportunity to represent the District in competition.  (*Id.*)  No one is excluded from participation because of his or her gender.  (*Id.*)

Unfortunately, the gymnastics program in the District has declined in participants, with only 57 female student athletes in grades 7 through 12 participating in the 2022-2023 school year.  (*Id.*, ¶ 11.)  Of this number, 10 seniors graduated in 2022-2023.  (*Id.*, ¶14.)  In that vein, it has been a consistent struggle to hire qualified coaches for the gymnastics program, and two of the four area high schools did not have a head gymnastics coach.  (*Id.*, ¶ 13.)  The difficulty to attract student athletes and coaches has been exasperated by the rise of private gymnastic "academies" in South Dakota, where female student athletes decide to otherwise participate, causing a decline in the enrollment of female student athletes in the District's gymnastics program.  (*Id.*, ¶ 15.)  Due to this lack of high school gymnastics participation, not all of the area high schools could qualify for the State Team Competition because of a lack of female athletes needed on the respective teams.  (*Id.*, ¶ 12.)

In contrast, softball and female wrestling has shown immense initial signs of popularity in the District.  (*Id.*, ¶ 17.)  As reflected in Exhibit B, 96 female high school athletes participated in softball during the 2022-2023 school year.  (*Id.*)  Likewise, 25 female high school athletes participated in wrestling during the 2022-2023 school year.  (*Id.*)  Over 60 female student

athletes participated in wrestling during the 2022-2023 school year when middle school and high school numbers are combined, which is already more participants than gymnastics. (*Id.*)

The ultimate decision to eliminate the gymnastics program from the budget was an informed decision based upon a number of factors, including the declining participation in the gymnastics program, the difficulty in hiring and retaining an adequate number of coaches to ensure athlete safety, the amount of money required to continue funding the program in light of declining participation, and the belief that resources could be used more effectively in other areas to provide additional opportunities for females to participate in sporting activities. (*Id.*, ¶ 22.) Based on the above, a fiscal year 2024 proposed budget for the District was considered by the School Board in April, 2023 that included the elimination of the gymnastics program. (*Id.*, ¶¶ 19-20); (*see also Affidavit of Alex Hagen*, Ex. G.) The Board voted unanimously to adopt the 2024 proposed budget on April 24, 2023. (*Stavem Aff.*, ¶ 20.) The Board is comprised of four female members and one male member. (*Id.*, ¶ 18.) On July 10, 2023, the Board approved the final 2023-2024 school year budget, which included eliminating funding for the gymnastics program. (*Id.*, ¶ 21.) No members of the public, or representatives of Plaintiffs, voiced any opposition to the passage of the final budget. (*Id.*) This action was then filed on September 12, 2023. (*Id.*)

The above timing of Plaintiffs' filing of the action is problematic, as the District's final budget was approved on July 10, 2023 and the 2023-2024 academic year has already begun. (*Id.*, ¶ 23.) The gymnastics season begins on October 30, 2023. (*Id.*) There are no coaches, no contests scheduled, no buses, and local area teams have found other meets outside of Sioux Falls to attend. (*Id.*, ¶¶ 23-28.) Moreover, some gymnastics equipment previously used by the District is no longer viable and in usable condition for another gymnastic season. (*Id.*, ¶ 25.) It

would cost an additional $260,000-$300,000 to purchase new equipment.  (*Id.*)  In addition, high schools have begun utilizing the practice spaces previously used by gymnastics for other activities, including yoga, competitive cheer, competitive dance, weight training, and other activities.  (*Id.*, ¶ 27.)  To complicate matters further, the budget has been set since July 10, 2023, and the addition of any new athletic program would require the reduction in services to other areas already supported by the budget.  (*Id.*, ¶ 28.)  In the 2022-2023 school year, the Sioux Falls School District spent $67,981.19 on the gymnastics program.  (*Id.*, ¶ 30.)  If ordered to retain a gymnastics program this year, the cost would exceed $68,000, as the program was budgeted for $92,090 for the 2023-2024 school year, and new, usable equipment will need to be purchases that could cost the District an additional $260,000-$300,000.  (*Id.* ¶¶ 25, 30.)

The Sioux Falls School District must be responsible in its fiscal management of public funds.  (*Id.*, ¶ 31.)  The School Board made the decision to eliminate the gymnastics program for a variety of reasons, including being fiscally responsible with public money and to serve, in the judgment of the School Board, the public interest.  (*Id.*)  It provided early notice in April 2023, of its decision to eliminate gymnastics which was months before the District's 2023-2024 budget eliminating the gymnastics program was ultimately approved.  (*Id.*)

## **LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant."  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (internal citation omitted).  A court considers four factors when determining whether to order a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public

interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citing *Dataphase Sys., Inc.*, 640 F.3d at 113). Applying the four-part *Dataphase* test, Plaintiffs are unable to demonstrate that a preliminary injunction is appropriate in this case, and their Motion should be denied.

## ARGUMENT

I.    **Plaintiffs Are Not Likely to Succeed on the Merits of Their Title IX Claim Because the District Is Compliant with Title IX's Effective Accommodation Requirement and Individuals Are Not Subject to Suit Under Title IX.**

As the moving party, Plaintiffs must show they have a probability of success on the merits of their case. *Hanson v. United States*, 540 F.2d 947, 948 (8th Cir. 1976) (affirming denial of preliminary injunction where plaintiff failed to show a probability of success on the merits). Here, Plaintiffs are not likely to succeed on the merits of their Title IX claim.[1]

First, Plaintiffs' Title IX claims against Defendants Stavem and Meile are not legally viable. "Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a), . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). "Title IX will not support an action" against individual school officials. *See Kinman v. Omaha Public Sch. Dist.*, 171 F.3d 607, 611 (8th Cir. 1999); *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 730 (6th Cir.1996) (Nelson, J., concurring) (stating only educational

---

[1] Plaintiffs do not discuss the merits of Count 2 of their Complaint in their Brief. Plaintiffs' 42 U.S.C. § 1983 claim is tied to its Title IX claim. Because the District disputes the merits of Plaintiffs' statutory claim, it also disputes Plaintiffs' success on the merits of its constitutional law claim.

institutions may be found liable for Title IX violations).  As such, Plaintiffs cannot show a probability of success on their Title IX claims against individual Defendants Stavem and Meile.

Second, Plaintiffs cannot show a likelihood of success on the merits of their Title IX claim against the District. "Title IX challenges usually fall into two groups: (1) participation-opportunities challenges[ ] and (2) treatment-and-benefits challenges[.]" *Portz v. St. Cloud State Univ.*, 16 F. 4th 577, 580-81 (8th Cir. 2021).  In their Brief, Plaintiffs assert a participation-opportunities challenge. (Plaintiffs' Brief at 16-19 (focusing on the "three-part test").)

A participation-opportunities challenge under Title IX is also referred to as an effective accommodation claim, because it arises from the Department of Health, Education, and Welfare's regulation requiring "effective accommodation of the interests and abilities for both sexes (i.e., equitable participation opportunities)." *Portz*, 16 F.4th at 580 (cleaned up).  To survive a participation-opportunities challenge, an institution "must <u>meet one</u> of three standards, known as the 'three-part test.' " *Id*. at 581 (emphasis added) (citing 44 Fed. Reg. at 71413, 71418 (1979)).  "Courts refer to the three standards in the three-part test as Prongs One, Two, and Three." *Id*.  Prong One requires participation opportunities provided to male and female students be substantially proportionate in number to their respective enrollments. *Id*.  Prong Two requires a history and continuing practice of program expansion responsive to the developing interests and abilities of females.  *Id*. Prong Three requires the present program has fully and effectively accommodated the interests and abilities of females.  *Id*.

Compliance <u>with any one</u> of the three prongs constitutes compliance with Title IX.  *Id*. As the Eighth Circuit has explained, "[i]f an institution has met any part of the three-part test, . . . the institution is meeting this [equitable athletic participation] requirement." *Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042, 1045-46 (8th Cir. 2002) (internal citation omitted).  Courts in the

Eighth Circuit have consistently applied the three-part test to measure equitable athletic

participation opportunities.  *Id.* at 1046-47; *see also Portz*, 196 F. Supp. 3d at 975 (holding that

the three-part test provides college athletics departments with "three different ways" of

complying with Title IX in a case challenging the elimination of women's sports teams); *Gonyo*

*v. Drake Univ.*, 879 F. Supp. 1000, 1004 (S.D. Iowa 1995) (relying on the three-part test,

specifically Prong One in granting summary judgment for defendant university).  The overall

determination of an institution's compliance looks to (a) whether the policies of an institution are

discriminatory in language or effect; (b) whether disparities of a substantial and unjustified

nature in the opportunities afforded male and female athletes exist in the institution's program as

a whole; or (c) whether disparities in individual segments of the program with respect to

opportunities are substantial enough in and of themselves to deny equality of athletic

opportunity.  44 Fed. Reg. at 71417-418.

Under *Dataphase*, Plaintiffs bear the heavy burden of showing that they have a

"substantial likelihood" or "fair chance" of prevailing on the merits of their claims.  *See Planned*

*Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008).  Here, Plaintiffs

cannot demonstrate a substantial likelihood of success on the merits where their entire analysis is

speculative and theoretical on the 2023-2024 academic year, which has not been completed.

Moreover, the District currently complies with Title IX because it is able to satisfy multiple

prongs of the three-part test, its policies are not discriminatory, and it provides equal

opportunities to its male and female athletes.

### A.    Prong One of the Three-Prong Test Is Satisfied Because the District Offers Proportionate Participation Opportunities to Its Female Students.

Prong One requires an institution to show its "participation opportunities for male and

female students are provided in numbers substantially proportionate to their respective

enrollments[.]" *Chalenor*, 291 F.3d at 1045 (citing 44 Fed. Reg. 71413 at 71418).  "Title IX plaintiffs bear the burden of proving a defendant's failure to satisfy Prong One's substantial proportionality requirement by showing an actionable 'disparity' in participation opportunities by sex." *Anders v. Cal. St. Univ., Fresno*, 2021 WL 1564448, *4 (E.D. Cal.  Apr. 21, 2021); *see also Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 273 (6th Cir. 1994).  To this vein, substantial proportionality hinges on a case-by-case analysis, not by the mechanical application of bright-line statistical tests.  There is no bright-line test measuring substantial proportionality; instead, a more sensitive case-by-case analysis focused on each school's individual circumstances is appropriate.  *See, e.g.*, *Oilier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014) (holding "there is *no magic number* at which substantial proportionality is achieved" and that, when assessing substantial proportionality, courts must "look beyond the raw numbers to the institution's specific circumstances and the size of its athletics program." (emphasis added) (internal citations omitted)); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 106-07 (2d Cir. 2012) ("But as the 1996 Clarification makes clear, substantial proportionality is *not determined by any bright-line statistical test* . . . . [W]e do not, in any event, understand the 1996 Clarification to create a statistical safe harbor at [2%] or any other percentage.  Instead, the Clarification instructs that substantial proportionality is properly determined on a 'case-by-case basis' after a careful assessment of the school's 'specific circumstances,' including *the causes* of the disparity and the reasonableness of requiring the school to add additional athletic opportunities to eliminate the disparity." (emphasis added) (citations omitted)); *Equity in Athletics v. U.S. Dep't of Educ.*, 639 F.3d 91, 110 (4th Cir. 2011) (holding that "the [Department of Education] has expressly noted that determinations of what constitutes 'substantially proportionate' under the first prong of the Three-Part Test should be

*made on a case-by-case basis . . . rather than through use of a statistical test*" and confirming there is no "magic number at which substantial proportionality is achieved." (emphasis added) (citing Letter from Norma V. Cantú, Assistant Secretary for Civil Rights, Department of Education (Jan. 16, 1996) ("1996 Clarification")); *Cohen v. Brown Univ.*, 101 F.3d 155, 171 (1st Cir. 1996) (holding that "the substantial proportionality test of prong one is applied under the Title IX framework, *not mechanically, but case-by-case, in a fact-specific manner*" and that Title IX does not "mandate[ ] a finding of discrimination based solely upon a gender-based statistical disparity.") (emphasis added); *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 829-30 (10th Cir. 1993) (noting that OCR had long ago instructed "its Title IX compliance investigator that *there is no set ratio* that constitutes 'substantially proportionate' or that, when not met, results in a disparity[.]") (emphasis added).  Because the District provides substantially proportionate participation opportunities for its male and female students, the District satisfies Prong One.

For the 2023-2024 academic year, the District is offering <u>eleven</u> female sports (<u>twelve</u> including sideline cheer) and <u>eight</u> male sports:

| **Female Sports** | **Male Sports** |
|---|---|
| 1. Cross Country | 1. Cross Country |
| 2. Golf | 2. Golf |
| 3. Soccer | 3. Soccer |
| 4. Tennis | 4. Tennis |
| 5. Track & Field | 5. Track & Field |
| 6. Basketball | 6. Basketball |
| 7. Wrestling | 7. Wrestling |
| 8. Softball | 8. Football |
| 9. Volleyball | |
| 10. Competitive Cheer | |
| 11. Competitive Dance | |

(*See Stavem Aff.*, Ex. A.)  Plaintiffs may attempt to argue competitive cheer and competitive

dance (or even sideline cheer) are not sports.  In its 2008 Guidance Letter, however, OCR noted:

> Many institutions are members of intercollegiate athletic organizations, such as the
> National Collegiate Athletic Association and the National Association of
> Intercollegiate Athletics, or state high school associations that have organizational
> requirements, which address the factors identified by OCR [as defining when an
> activity is a sport].  When the organizational requirements satisfy these factors and
> compliance with the requirements is not discretionary, <u>OCR will presume that such
> an institution's established sports can be counted under Title IX</u>.

Letter from Stephanie Monroe, Assistant Sec'y for Civil Rights, Office of Civil Rights, Dep't of

Educ., to Colleagues (Sept. 17, 2008)[2] (emphasis added).  Moreover, the SDHSAA recognizes

both competitive cheer and competitive dance as sports.  Accordingly, the District is entitled to a

presumption that each is considered a sport under Title IX.  *See also Biediger v. Quinnipiac

Univ.*, 728 F. Supp. 2d 62, 101 (D. Conn. 2010) ("I have little doubt that at some point in the

near future—once competitive cheer is better organized and defined, and *surely in the event that

the NCAA recognizes the activities as an emerging sport*—competitive cheer will be

acknowledged as a bona fide sporting activity by academic institutions, the public, and the law.")

(emphasis added).  Therefore, from a broad sports-offering perspective, the District provides

<u>more</u> sport opportunities to its female athletes than its male athletes.  And notably, the District

offers only one male-dominated sport (i.e., football[3]), whereas it offers four female-dominated

sports (i.e., volleyball, softball, competitive cheer, and competitive dance[4] (five female-

dominated sports if sideline cheer is included)).

---

[2] Available at: *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20080917.html* (last
visited Sept. 28, 2023).

[3] Technically, females can go out for football, though historically female participation in football
has been very low.

[4] Technically, males can go out for both competitive cheer and competitive dance, though
historically male participation in those two sports has been very low.  Males are not allowed to

The inquiry does not end there.  Courts and OCR do not look solely at sport offerings when analyzing compliance under Title IX; they also look at actual participation numbers relative to enrollment numbers.  *Anders*, 2021 WL 1564448, at *4.  Because the 2023-2024 academic year just started, the District does not know (nor does anyone, including Plaintiffs) what participation numbers will look like for the current academic year.  However, in the 2022-2023 academic year, enrollment numbers were as follows:

|  | Total | Males | Male % | Females | Female % |
|---|---|---|---|---|---|
| **2022-2023 Enrollment:** | 7367 | 3761 | 51.05% | 3606 | 48.95% |

(*See Stavem Aff.*, Ex. A.)  Participation numbers in the District sport programs in the 2022-2023 academic year were as follows:

### 2022-2023 Participation Numbers

|  | Male | Female |
|---|---|---|
| Cross Country | 102 | 40 |
| Golf | 119 | 69 |
| Soccer | 158 | 161 |
| Tennis | 90 | 71 |
| Track & Field | 479 | 264 |
| Basketball | 232 | 139 |
| Wrestling | 106 | 25 |
| Football | 454 | 1 |
| Softball | 0 | 96 |
| Volleyball | 0 | 167 |
| Competitive Cheer | 1 | 80 |
| Competitive Dance | 1 | 59 |
| Gymnastics |  | 57 |
| Total: | 1742 | 1229 |

(*See Stavem Aff.*, ¶ 8, Ex. B.)  As the table shows, the District was 7.6% away from achieving exact proportionality.  In terms of actual participation numbers, 441 additional female

---

go out for volleyball or softball, meaning, at a minimum, the District offers two only-female participant sports.

participants or 460 fewer male participants were needed to achieve exact proportionality.  These numbers, however, do not include the number of female participants in sideline cheer.  When including sideline cheer participants, the District was 4.6% away from exact proportionality.

Not surprisingly, Plaintiffs ask the Court to end its analysis of Prong One here, because there is authority suggesting that such a disparity does not amount to substantial proportionality. (Plaintiffs' Brief at 19); *see Biediger*, 691 F.3d at 85.  But federal regulations demand a more detailed analysis to determine whether any disparity is "unjustified" and whether the disparities are "substantial enough in and of themselves to deny equality of athletic opportunity."  *See* 44 Fed. Reg. 71413 at 71418 (discussing the overall determination of compliance); *Oilier*, 768 F.3d at 856 (holding "there is no magic number at which substantial proportionality is achieved" such that courts must "look beyond the raw numbers to the institution's specific circumstances and the size of its athletics program"); *Biediger*, 691 F.3d at 106-07 (same); *Equity in Athletics*, 639 F.3d at 110 (" what constitutes 'substantially proportionate' under the first prong of the Three-Part Test should be *made on a case -by-case basis*[.]") (emphasis added).

Closely examining the participation numbers in the 2022-2023 academic year reveal the disparity between male and female athletes is not because of any discrimination in which the District engaged, but instead is merely a result of the District's existing male student body's desire to participate in certain sports (that are also offered to female students) at extremely higher numbers.  Indeed, the disparity stems almost entirely from five sports: track & field, basketball, cross country, golf, and tennis, all of which are programs offered to both male and female students.  Participation numbers for those five sports in the 2022-2023 academic year created a 439-participant disparity.  In track & field alone, 215 more males participated than females.  In cross country, 62 more males participated than females.  And in basketball, 93 more males

participated than females, even though there is no cap on rosters or participation opportunities. Had females participated in said sports at or near the same rate as their male counterparts, exact proportionality would nearly be reached.

Moreover, there is no evidence that the disparity that existed last year is the result of any discrimination on behalf of the District.  Indeed, track & field, basketball, cross country, golf, and tennis have been staples in high school sports for decades, with strong support from both sexes.  Yet, 439 more males than females participated in those five sports.  There is no evidence whatsoever that such a disparity is the result of discrimination on behalf of the District. Therefore, the disparity is justified, and it is not substantial enough in and of itself to find the District engaged in discrimination in violation of Title IX.  44 Fed. Reg. 71413 at 71418 (discussing the overall determination of compliance).

Plaintiffs argue a 7.6% proportionality gap is under Prong One is not "substantially proportional," and suggest this percentage (or even a 4.6% disparity with the inclusion of sideline cheer) is too high.  (Plaintiffs' Brief at 16.)  But the Court must look at the larger picture and where the disparity lies, carefully assessing the District's "specific circumstances" including the causes of any alleged disparity on a case-by-case basis.  *See, e.g.*, *Biediger*, 691 F.3d at 106-07.  Closely examining the participation numbers in the 2022-2023 academic year reveal the disparity between male and female athletes is not because of any discrimination, but instead is merely a result of the District's male student body participating in sports also offered to their female counterparts at vastly higher numbers.

Furthermore, such percentage cases concern college universities and not school districts. (Plaintiffs' Brief at 16.)  This is significant, as the percentage of participants in university programs is capped by scholarships, roster spot availability, and other such factors that are

simply not applicable to a high school sports setting.  For example, universities only have a certain number of permitted participants on a male track team.  This is entirely different from the vast number of participants on a high school male track team, where all male students (and all female students for that matter) are afforded the opportunity to participate if desired.  The same goes for cross country.  Naturally, then, the universities in such cases will not have such a disproportionate number of male participants in the same sport, like 215 more male participants than female participants.  Accordingly, a university's percentages (1-4%) will be more proportional than that of a school district's percentages.  For these reasons, a case-by-case analysis of the underlying facts is appropriate.  Under this analysis, the District provides equal opportunities to its male and female athletes, and the specific circumstances of any alleged disparity make clear the District satisfies Prong One and offers proportionate participation opportunities to its female students.

Finally, the District does not deny any athletic participation because of gender.  No individual is told that he or she may not play because they are male or female.  Everyone, regardless of sex, has some opportunity to represent the District in programs.  No one is excluded from participation because of his or her gender.  The "supply" of athletic opportunities is reasonably proportionate to the "demand" for athletic participation opportunities.  Any gender imbalance in participating in such is not due to any discrimination from the District.  For these reasons, Plaintiffs' Motion should be denied.

B.    **Prong Two of the Three-Part Test Is Satisfied Because the District Has a History and Continuing Practice of Program Expansion Responsive to the Developing Interests of Its Female Student Body.**

Prong Two requires "the institution [to] show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of

the members of that sex." *Chalenor*, 142 F. Supp. 2d at 1157 (citing 44 Fed. Reg. 71413 at 71418). The District also satisfies this Prong of the three-part test, as the District has a strong history and continuing practice of program expansion responsive to the developing interest of its female student body.

As shown in the District's data, the District has been able to nearly double female sport participants in the last 18 years, from 641 female participants in 2004 to 1229 participants in 2022, while its female enrollment only increased from 2,179 to 3,606. (*See Stavem Aff.*, Ex. A.) Moreover, the District has added two new female-participant sports in the last 2 years: female wrestling in 2021 and softball in 2022. (*Id.*, ¶ 9.) The net result of adding these two new sports while eliminating gymnastic has resulted in increased female participation in the District (121 female participants in softball and wrestling, as opposed to 57 in gymnastics). (*See Stavem Aff.*, Ex. A-B.) This is a clear history of continuing expansion of female sport opportunities.

Moreover, while sympathetic to Plaintiffs' desired sport of choice, trends suggest softball and wrestling are growing in popularity among female high school students compared to gymnastics. (*Id.*, ¶¶ 15-17.) Gymnastics was unfortunately a dying sport in the District. (*Id.*, ¶¶ 14-15.) Numbers have trended down in the last seven years, the District could not find coaches for all 4 high schools, and not all of the 4 high schools had enough participants to compete in team events. (*Id.*, ¶ 12.) The District is tasked with providing equal opportunities to all 4 of its high schools and does not look favorably on offering a sport at only one or two high schools. (*Id.*) This was the unfortunate reality of the gymnastics program in the District.

Gymnastics wasn't dying just in the District. Rapid City School District cut its gymnastics program as well due to low participation numbers. (*Id.*, ¶ 29.)[5] In fact, only 24 (out of 180) high schools in the entire state of South Dakota offer gymnastics, the other 156 do not. (*Id.*) Of the 19 schools classified as "Double A" in basketball/volleyball, only 9 offer gymnastics. (*Id.*) Put simply, there is not significant interest in school-sponsored gymnastics in the state of South Dakota. The District's decision to eliminate the gymnastics program is a result of that fact, not because of some purported discrimination as argued by Plaintiffs.

The District has a history and continuing practice of program expansion that is demonstrably responsive to the ever-changing interests of its female student body and females across the State. The District has been able to nearly double female participants in District programs in the last 18 years and has added 2 new programs in the last 2 years, which has resulted in an increase in female participants, even in light of its elimination of the gymnastics program. Accordingly, the District complies with Prong Two, and for this additional reason, Plaintiffs' Motion should be denied.

### C.     It is Premature to Find the District is Out of Compliance Through the 2023-2024 Academic Year.

Finally, Plaintiffs offer no non-speculative, factual basis for asserting the District will not comply with Title IX during the current 2023-2024 academic year, when the vast majority of the District's sport seasons have not yet begun, including the District's new female wrestling and softball programs. Plaintiffs cannot provide any non-speculative, factual basis for asserting the District will not comply with Prong One this year as required. Accordingly, Plaintiffs have

---

[5] Rapid City Journal, *Gymnastics Axed at RCAS Due to Low Numbers*,
https://rapidcityjournal.com/sports/local/gymnastics-axed-at-rcas-due-to-low-numbers/article_0aca6a43-1e73-5a2d-99c4-b4567da79a14.html (last visited Sept. 28, 2023).

offered no persuasive basis on which this Court could enjoin the District's decision to discontinue gymnastics for the 2023-2024 academic year.

Said another way, even if the Court were to find the District currently does not meet Prong One or Prong Two (which the District contends it does), that does not mean the District is out of compliance for the 2023-2024 academic year because participation numbers for this academic year are currently unknown given the academic year has just started.  Plaintiffs must bear the burden of demonstrating the District will be unable to comply with the three-prong test during the 2023-2024 academic year in order to enjoin the elimination of the gymnastic program. Yet neither side (nor this Court) can predict with reliability where the District will land at the conclusion of the 2023-2024 academic year.  Such speculation necessitates denial of Plaintiffs' Motion.

As described above, based on actual participation data from the most recent available years, the District expects to be compliant in the 2023-2024 academic year with a small disparity that is not unreasonable nor unjustified, and could be easily managed if needed.  Particularly with the elevation of female wrestling and softball, "compliance [with Title IX] might well be achieved by the elevation [of resources devoted to] one sport" to another.  *Boucher v. Syracuse Univ.*, 164 F.3d 113, 116 (2d Cir. 1999); *see also Miller v. University of Cincinnati*, 241 F.R.D. 285, 290 (S.D. Ohio 2006) ("compliance could conceivably be achieved, in part, by taking away the allegedly paltry resources allocated to women's rowing, and bestowing them along with new resources on other women's varsity sports[.]"); *Roberts*, 998 F.2d at 833 ("an order specifically requiring an institution to maintain a softball team [may go] further than necessary to correct a violation of Title IX.").

Nonetheless, should the Court find that exact proportionality is needed in order to cut a female sport, the District can cap male participation numbers to ensure such exact proportionality. "Limiting men's teams in pursuit of equalizing athletic opportunities between the sexes is consistent with Title IX." *Chalenor*, 291 F.3d at 1046 (citing 1996 Clarification). "An institution can choose to eliminate or cap teams as a way of complying with part one of the three-party test." *Id*. That decision is not required by this Court (or the District) at this juncture.

Ultimately, the Court needs to answer a simple question: When can a public school district decide to eliminate a female sport? If the answer to that question is only when there is exact proportionality, the District should be allowed to achieve exact proportionality in the 2023-2024 academic year before it is ordered to bring back the gymnastics program. However, the District does not believe exact proportionality is a prerequisite to eliminating a female sport. Instead, where a school district (a) has a sport with dwindling participation numbers and an inability to retain a sufficient number of coaches, (b) a history of expanding female opportunities (e.g., by nearly doubling female participation numbers in an 18-year period), and (c) a plan in place to ensure continued expansion (e.g., by adding two popular female sports that already have greater participation than the sport eliminated), such district should be allowed to eliminate the dying program. Such a decision is not discriminatory under Title IX, but a reasonable and responsible decision for a public school district charged with doing what's best for the District as a whole, not what's desired from a small number of its students who enjoy a particular sport.

## II. The Balance of Harms Inquiry Favors the District Because Plaintiffs Waited Too Long to Seek Injunctive Relief.

Further, the balance of harms analysis favors the District because Plaintiffs waited too long to seek injunctive relief. *Dataphase Sys., Inc.*, 640 F.2d at 113. To receive injunctive relief, the moving party must show that it faces "a sufficient threat of irreparable harm."

*Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999).  The purpose of granting an injunction is to "prevent such a change in the relations and conditions of persons and property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated."  *Love v. Atchison, T. & S. F. Ry. Co.*, 185 F. 321, 331 (8th Cir. 1911); *see also Dataphase*, 640 F.2d at 113 ("[T]he question is whether . . . justice requires the court to intervene to *preserve the status quo* until the merits are determined.") (emphasis added). When a party delays in bringing a motion for a preliminary injunction until after conditions have changed, then the motion no longer seeks to preserve the status quo, but rather, seeks to change the status quo back to how things used to be.  *See Cenveo Corp. v. S. Graphic Sys., Inc.*, 2009 WL 161210, at *3 (D. Minn. Jan. 22, 2009) ("The status quo refers to the *existing* state of affairs, and preliminary injunctive relief cannot go back in time and recapture the status quo of an earlier time.") (emphasis added).

Plaintiffs admit they've known the gymnastics program was eliminated back in April 2023.  (Plaintiffs' Brief at 4.)  As such, if Plaintiffs wanted to enjoin the District from eliminating gymnastics and protecting the status quo, Plaintiffs should have requested this Court intervene last spring, when the program was being discontinued and the 2023-2024 budget for the District had yet to be allocated.  Instead, Plaintiffs ask the Court to now do so months after the 2023-2024 academic year has started and a mere month before the winter sport season begins on October 30, 2023.  (Plaintiffs' Brief at 2.)

Despite their delay, Plaintiffs ask the Court to "restore the status quo" by ordering the gymnastic program reinstated during the pendency of this case.  But an "unreasonable" delay negates a finding of irreparable injury.  *See Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 936 (8th Cir. 2002).  Here, Plaintiffs' delay was unreasonable, and negates a finding of

irreparable injury.  As of April 2023, Plaintiffs knew that the gymnastic program was being

eliminated.  (Plaintiffs' Brief at 4.)  At that time, coaches were still employed by the district, the

district could still schedule competitions, the district could schedule facilities and maintain

gymnastic equipment, schedule buses, and prepare for a 2023-2024 season.  (*See Stavem Aff.*,

¶¶ 23-28.)  Now, however, there is no longer any possibility that the status quo could be

maintained.  *See, e.g.*, *CHS, Inc. v. PetroNet, LLC*, 2010 WL 4721073, at *3 (D. Minn. Nov. 15,

2010) (finding no irreparable injury after a multiple month delay); *H.D. Vest, Inc. v. H.D. Vest

Mgmt. & Servs.*, *LLC*, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) (finding delay of

multiple months to seek injunctive relief undermined claim of irreparable injury); *Cafferty v.

Trans World Airlines, Inc.*, 488 F. Supp. 1076, 1080 (W.D. Mo. 1980) (holding that "[t]he

clearest reason for denying the injunction" is that a preliminary injunction would restore "a status

quo which has been dead for more than a year prior to the filing of suit"); *cf. Beame v. Friends of

the Earth*, 434 U.S. 1310, 1313 (1977) (holding delay to seek a stay unreasonable when

petitioner waited maximum time to file a certiorari petition and waited until 20 days after filing

the petition to seek the stay).

     Plaintiffs suggest the District's position is riddled with "myths."  (Plaintiffs' Brief at 5.)

Respectfully, these alleged "myths" to Plaintiffs are true realities to the District.  It is simply far

too late to "maintain the status quo" for the 2023-2024 gymnastics season, and the reasons the

gymnastics program was failing in the 2022-2023 academic year are expounded at this juncture.

There is (1) no feasible way to schedule competitions; (2) no feasible way to schedule busing; (3)

no feasible way to schedule facilities; and there are (4) no coaches to coach the teams.  (*See

Stavem Aff.*, ¶¶ 23-28.)  Moreover, the District's 2023-2024 budget was already approved, at a

meeting in which none of the plaintiffs came and voiced any objection.  (*Id.*, ¶ 21.)  If the Court

were to order an injunction and require the gymnastics program be reinstated, where should the District take money from? (*Id.*, ¶¶ 23-28.)  For these reasons, Plaintiffs' delay in bringing their Motion is significant and negates a finding of irreparable harm, barring injunctive relief. *See McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119, 1125 (8th Cir. 2015) (explaining that a "[d]elay is only significant if the harm has occurred and the parties cannot be returned to the status quo[.]" (internal citation omitted)).

By contrast, if Plaintiffs' Motion is granted, the District will be required to bring back a program that has been eliminated since April, 2023.  This would require hiring a new coaching staff (which the District already could not do in 2022) and re-equipping a discontinued program. (*See Stavem Aff.*, ¶¶ 23-28.)  This would also require the District to take funds allocated to other programs after the District's budget was approved in July, 2023 (with no public comment from Plaintiffs).  (*Id.*)  Considering all these factors, the balance of harm weighs in the District's favor. *See Equity in Athletics, Inc.*, 291 Fed. App'x 517, 521-22 (4th Cir. 2008) (affirming denial of preliminary injunction where plaintiffs delayed filing the injunction motion until fifteen days before the program cuts were scheduled to go into effect and after the coaches had been terminated and funding reallocated).

A recent Eighth Circuit case, *Ng. v. Board of Regents of University of Minnesota*, is instructive.  2022 WL 602224 (D. Minn. 2022) *aff'd* 64 F. 4th (8th Cir. 2023).  There, the District Court found that "[n]othing in the record establishes that, even if the Court granted the preliminary injunction, the men's varsity gymnastics team could compete during the [upcoming] season." *Id.*, at *6.  As such, the District Court found the plaintiff's delay in bringing its preliminary injunction motion significant, negating a finding of irreparable injury because "[b]y

the time this motion was filed, there was no longer any possibility that the status quo could be maintained." *Id.*

On appeal, the Eighth Circuit affirmed, noting it was "unclear . . . the team would be capable of competing in the [upcoming] season." 64 F. 4th 992, 996 (8th Cir. 2023). The Court acknowledged that although the plaintiffs were harmed by not being able to compete, it noted "an injunction cannot resolve that harm because nothing in the record suggests that, even if the injunction issued, [the gymnasts] could compete this year." *Id.* "Given that the injunction motion was not filed until November 2021 and that the majority of the coaching staff" had left, "it would have been improbable at best for the team to have competed in [the upcoming] season." *Id.* at 998. The Court concluded: because plaintiffs "sought an injunction after it would have been possible to 'preserve the status quo,' we hold that the delay was unreasonable and that it consequently defeated [the plaintiff's] goal of preventing irreparable harm." *Id.* (citing *Dataphase Sys., Inc.*, 640 F.2d at 113).

The same is true here. An injunction cannot resolve Plaintiffs' alleged harm because nothing in the record suggests that, even if the Court were to issue an injunction, the District's gymnastics program could compete this year. Given that the injunction was not filed until well into the 2023-2024 academic year, after the District's 2023-2024 budget has been allocated, a few weeks before the start of the winter sport season, Plaintiffs' delay is unreasonable, and defeats their goal of preventing irreparable harm. (*See Stavem Aff.*, ¶¶ 23-28.) Instead, the status quo is that there is no longer a program, and there has been no program for some time. *See Equity in Athletics, Inc.*, 291 F. App'x at 521-22 (finding that a delay was significant when the motion for preliminary injunction was not filed until 15 days underline prior to the date the program cuts were scheduled to go into effect where coaches had already been terminated, competitions had

been cancelled, and funding had already been reallocated to other athletic programs).  Plaintiffs'
delay is significant, and the Court should give significant weight to the timing of Plaintiffs'
request when the District approved and publicized the program cuts in April and July of 2023.

In that vein, the issuance of an injunction reinstating the team would upset, not preserve,
the status quo. Courts are loath to issue injunctive relief that disturbs the status quo pending the
determination of the merits.  *See, e.g.*, *Jones v. Pub. Hous. Agency of St. Paul*, 2018 WL
3104269, at *1-2 (D. Minn. Feb. 27, 2018), *adopted in its entirety*, 2018 WL 1535935 (D. Minn.
Mar. 29, 2018) (denying emergency injunctive relief to a former recipient of rental assistance
because, at the time she sought relief, "the current status quo is that she receives no assistance"
and her request served to ask "the Court not to preserve the status quo but to revert it [to the]
past"); *Cenveo Corp., Inc.*, 2009 WL 161210, at *3 (D. Minn. Jan. 22, 2009) (holding that when
the complained-of conduct "occurred some time ago" a preliminary injunction is not necessary
because "the status quo refers to the *existing* state of affairs, and preliminary injunctive relief
cannot go back in time and recapture the status quo of an earlier time") (emphasis in original).
Because the program has been eliminated for some time, Plaintiffs' request would not serve the
purpose of a preliminary injunction: the preservation of the status quo pending resolution on the
merits.  This additional factor weighs in favor of denying Plaintiffs' Motion.

## III.  Plaintiffs Cannot Show Irreparable Harm.

Plaintiffs have suffered no legally-cognizable injury nor irreparable harm.  There is little
doubt that Plaintiffs are greatly disappointed in the decision to eliminate the gymnastic program,
but there is no "property interest in . . . athletic participation."  *Equity in Athletics, Inc.*, 639 F.3d
at 109; *see, e.g.*, *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir.
2002) ("There is no constitutional right to participate in intercollegiate athletics.").  A protected

property interest cannot be created by the Fourteenth Amendment itself, but rather must be created or defined by an independent source. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Other courts addressing this issue have consistently held that "the interest of student athletes in participating in [ ] sports was not constitutionally protected.  *See, e.g.*, *Colo. Seminary v. Nat'l Collegiate Athletic Ass'n,* 570 F.2d 320, 321 (10th Cir.1978);  *Lesser v. Neosho Cmty. Coll.,* 741 F. Supp. 854, 861 (D.Kan.1990).  To be clear, this was a decision the District did not take lightly.  The District acknowledges the sport of gymnastics is important to Plaintiffs. However, the District is vested with the obligation to be a good steward of the public's funds and made a decision it believes is in the best interest of the District, its student body as a whole, and will allow the District to expand the overall opportunities for female students.

Similarly, cognizant of the importance of the sport to Plaintiffs, student-athletes have no right to a given team if the District complies with Title IX's three-prong test in the aggregate. Plaintiffs' sole possibility of a legally-cognizable injury tied to the elimination of the gymnastics team is Plaintiffs' alleged civil rights claim.  But, absent a civil rights violation, Plaintiffs' have no right to "participate in any particular sport in one's [high school] [.]" *Gonyo*, 837 F. Supp. At 994; *see also In re United States ex rel. Missouri State High School Activities Ass'n*, 682 F.2d 147, 153 n. 8,  (8th Cir.1982) (quoting *Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d 152, 159–60 (5th Cir.1980);  *Mayerova v. E. Michigan Univ.*, 2019 LEXIS 9373, at *2-3 (6th Cir. Mar. 28, 2019) ("[T]itle IX requires equality between men's and women's teams, not that certain teams (say women's softball) be reinstated rather than other sports teams be created, supported, or expanded"); *Cohen v. Brown University*, 991 F.2d 888, 906 (1st Cir. 1993) ("Title IX does not require institutions to fund any particular number or type of athletic opportunities— only that they provide those opportunities in a nondiscriminatory fashion[.]").  Plaintiffs are free

to participate in other District sports or club gymnastics if they choose.  While sensitive to the disruption involved in this choice, there is respectfully no cognizable legal right being lost. Unless Plaintiffs ultimately prevail on the merits in this case, the harm to plaintiffs is not in the nature of harm to any legally-cognizable rights. Their Motion for preliminary injunction should be denied.

## IV.     Public Interest Favors the District Being Able to Control Its Own Programs.

The fourth and final *Dataphase* factor also counsels against granting an injunction because there is no public interest in its favor.  *See Dataphase*, 640 F.2d at 113.

Plaintiffs argue that a preliminary injunction serves the public interest because it would avoid a violation of their statutory and constitutional rights.  (Plaintiffs' Brief at 21.)  However, as discussed above, Plaintiffs cannot show that they have a fair chance of proving that any such violation has occurred.  Moreover, while the District is not unsympathetic to the Plaintiffs' position, Plaintiffs seemingly ask this Court to find a more "public interest" in their gymnastic team over other sport programs the District is now able to support, such as female wrestling and softball.

These interests stand in contrast to the District's.  Here, the District has an interest in equitable athletics participation opportunities for women and men.  It also has an interest in the responsible fiscal management of public funds as a public school district, and there is a public interest in the District's fiscal health.  (*See Stavem Aff.*, ¶ 31.)  The District made the difficult decision to adjust its athletic programs and did so in a transparent and student-focused way.  (*Id.*) It provided early notice in April of its decision, months before the District's 2023-2024 Budget was allocated on July 10, 2023.  (*Id.*)  None of the Plaintiffs attended the public District Budget

meeting in July to voice concern, nor did Plaintiffs move for an injunction prior to the allocation of the Budget.  (*Id.*, ¶ 21.)

Moreover, the District took an action it felt necessary, and the District should be permitted to manage its programs as it deems necessary and appropriate.  (*See Id.*, ¶ 31.)  The public interest weighs in favor of permitting school districts to set their own course in providing athletic opportunities without judicial interference or oversight, even if that means reducing the number of athletic opportunities the District chooses to offer.  This public interest favors the District's ability "to chart [its] own course in providing athletic opportunities without judicial interference or oversight, absent a clear showing that [it is] in violation of the law."  *Equity in Athletics, Inc. v. U.S. Dep't of Educ.*, 504 F. Supp. 2d 88, 112 (W.D. Va. 2007) (internal marks omitted), *aff'd Equity in Athletics, Inc. v. U.S. Dep't of Educ.*, 291 F. App'x at 524; *see also Gonyo*, 938 F. Supp. at 996.  For these reasons, the public interest factor weighs in the District's favor.  Plaintiffs' Motion should be denied.

**V.    Security Is Required Under Rule 65(c) in the Event the Court Issues a Preliminary Injunction.**

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order <u>only if</u> the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added).  In the event the Court issues a preliminary injunction, the District respectfully requests the Court require Plaintiffs give security in the amount of $92,090, which is the amount that was budgeted for the gymnastics program for the 2023-2024 year, although that amount will likely not cover the cost the District would sustain to reinstate a gymnastic team.  *See Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989) (concluding that district court erred in failing to require the posting of an additional bond

to protect the defendant in the event he prevailed on the merits); (*See also Stavem Aff.*, ¶¶ 25-30) (noting in the 2022-2023 school year, the District spent $67,981.19 on the gymnastics program and budgeted $92,000 for the 2023-2024 school year, but that reinstating gymnastics would exceed said cost, particularly as new equipment ranging around $260,000 - $300,000 is needed). This amount is a conservative bond request.

Put simply, a party seeking an injunction must be prepared to post a bond covering the likely costs to the opponent if the injunction should not have been granted. Under Rule 65(c), no preliminary injunction shall issue except upon the giving of security by the applicant, in a sum for the payment of costs and damages as may be incurred by the party who is found to be wrongfully enjoyed or restrained. *See Sturgis Motorcycle Rally, Inc. v. Rushmore Photos & Gifts, Inc.*, 529 F. Supp. 3d 940, 968-69 (D.S.D. 2021) (citing Fed. R. Civ. Pro. 65(c)). Indeed, the Eighth Circuit Court of Appeals has stated that security should be imposed "in an amount that *fairly* protects the [defendants] should it be ultimately found that the [defendants have] been wrongfully enjoined. *Glenwood Bridge, Inc., v. City of Minneapolis*, 940 F.2d 367, 373 (8th Cir. 1991) (emphasis added). And although the court has discretion in the amount of bond, the Eighth Circuit has made clear that it "will reverse [the district court's] order if [the district court] abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991) (emphasis added) (citing *Tanenbaum*, 889 F.2d at 789). "Courts in this circuit have almost always required a bond before issuing a preliminary injunction[.]" *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citation omitted); *see, e.g., Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d

1085, 1106 (S.D. Iowa 2020) (requiring a bond be posted by students in a Title IX preliminary injunction).  The Rule is unambiguous and unequivocal.

In this case, Plaintiffs try to downplay the financial impact reinstating gymnastics would have on the District, but, as explained above, the impact would be significant as the District's 2023-2024 budget is already approved and being utilized in the current academic year.  (*See Stavem Aff.*, ¶ 30.)  The District would have to pull funds from other programs.  (*Id.*)  For those reasons, the Court should require a security bond in the amount of $92,000.

## <u>CONCLUSION</u>

Plaintiffs cannot demonstrate a substantial likelihood of success on the merits and cannot point to a balance of harms or public interest which favors Plaintiffs' case.  Moreover, Plaintiffs' requested relief is premature, as the District anticipates compliance in the 2023-2024 academic year.  For the reasons stated above, the District respectfully requests the Court deny Plaintiffs' Motion.

Dated at Sioux Falls, South Dakota, this <u>29th</u> day of September, 2023.

DAVENPORT, EVANS, HURWITZ &
SMITH, L.L.P.

*/s/ Eric C. Schulte*

_____

Eric C. Schulte
Reece M. Almond
Alayna A. Holmstrom
206 West 14th Street
P.O. Box 1030
Sioux Falls, SD 57101-1030
Telephone (605) 336-2880
Facsimile (605) 335-3639
ralmond@dehs.com
eschulte@dehs.com
aholmstrom@dehs.com
    *Attorneys for Defendants*